## MONROVIA OIL CO. v. COMMISSIONER OF INTERNAL REVENUE.*

### MONROVIA NO. 2 OIL CO. v. SAME.

#### Nos. 7509, 7510.

Circuit Court of Appeals, Ninth Circuit.

April 20, 1936.

Thomas R. Dempsey, A. Calder Mackay, and Arthur McGregor, all of Los Angeles, Cal., for petitioners.

Frank J. Wideman, Asst. Atty. Gen., and J. Louis Monarch, Frederick W. Dewart, and Joseph M. Jones, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

DENMAN, Circuit Judge.

These petitions to review orders of the United States Board of Tax Appeals, which have been consolidated for the purpose of hearing in this court, seek reversals of decisions affirming the Commissioner's determination of deficiencies in income taxes of the first company for 1923 and 1924, and in the second for 1924 and 1925. In each case the pertinent issue is whether the taxpayer is an "association" within the meaning of that section of the revenue act which has appeared in identical form in all the tax acts under which the returns in these cases were made. We quote the provision from section 2 (2), Revenue Act of 1921 (42 Stat. 227):

"Sec. 2. That when used in this Act— * * *

"(2) The term 'corporation' includes associations, joint-stock companies, and insurance companies."

Briefly, the facts in each case are as follows:

Monrovia Oil Company v. Commissioner, No. 7509.

In September, 1922, one R. L. Casner and one Grover Lawler acquired an oil and gas lease upon land in the Signal Hill oil fields of Southern California. The terms of the lease provided for a 33⅓ per cent. royalty on oil produced to be rendered the lessor. The fair market value of this lease was $80,000.

A month before the acquisition of this lease, Lawler and Casner had organized the Monrovia Oil Company, a common-law trust, petitioner herein, by a declaration of trust which set up a structure composed of three trustees and an indefinite number of beneficiaries not exceeding in the value of their holdings, however, the so-called

*Rehearing denied June 8, 1936.

capital of the trust. The capital was to consist of 5,000 equal beneficial interests of the par value of $100 each. The trustees, to whom was given full power of management and control, subject in no wise to the direction of the beneficiaries, enjoyed, by the terms of the instrument, plenary power to carry on any lawful business and in particular the business of drilling for and selling oil. A majority of the trustees were authorized to act for all. Vacancies were to be filled by vote of the trustees. The assets of the trust were made the sole fund toward which those to whom the trust might become obligated could look for payment.

The full rights of the beneficiaries are nowhere expressly set out in the declaration of trust. From the whole, it is collectible that they were to share in the net profits in proportion to the amount of capital contributed by each. It is specifically provided that the beneficiaries had no estate, legal or equitable, in the trust res, enjoying, therefore, only a personal claim against the trustees. It was expressly declared that the beneficiaries were not to be considered partners or associates in any manner save as trust beneficiaries. They were not liable for any obligation of the trust to third parties. With the exception of a proviso giving to the beneficiaries the right, by a majority vote, to terminate the trust and form a corporation, the beneficiaries had no active function in the carrying on of the business of the organization.

The trustees were empowered to select officers. All commitments of the trust were to be made in the name of the entity, signed by its president and secretary, and sealed in a form provided by the declaration.

Only three certificates of beneficial interest were ever issued by the trust. These were sold, under permit from the California Corporation Commissioner, at a par value of $10 each, instead of the $100 stated in the declaration of trust, to Lawler and Mr. and Mrs. R. L. Casner.

Under the direction of Grover Lawler, who became the managing trustee of the enterprise, the trust procured the drilling of a single well, struck oil therein, and completed negotiations for the sale of all oil and gas produced. From that time forward, the business of the trust consisted of supervising the flow of oil from the well to its predetermined recipients, collecting the proceeds of the sale, and dividing them among those entitled thereto.

The financing of this enterprise was carried on, not by the issuance of certificates of beneficial interest, but by the sale of transferable contracts called "Participating Oil Agreements." Each such agreement, of which 2,000 were issued, bore a face value of $100 and purported to assign in praesenti to the holder thereof an undivided one-twentieth per cent. of the proceeds to be derived from the sale of the net production of the well, after the lessor's one-third royalty and the expenses of operation had been satisfied. The trust bound itself to use 80 per cent. of the money paid for the agreement in the drilling, completing, and equipping of the well. The trust retained full power to dispose of the oil and gas produced as it should see fit, without consulting the holders of participating agreements. The trust estate was made security for the performance of the obligations to the participating agreement holders.

Of the 2,000 participating agreements issued, 1,200 were designated as "preferred" and the remaining 800 as "common." The sole difference between these two classes was that the holders of the preferred were to be paid an amount equal to their contributions before anything was paid on the common interests. The 800 common "shares" were given to Lawler and Casner in exchange for the lease. Of the preferred, 200 were issued as part payment to a contractor who drilled the well on the property, and the remaining 1,000 issued to the public for cash.

The trust perfected its single well and sold sufficient oil and gas therefrom to pay to the holders of the participation agreements the sum of $36,000 in 1923 and the sum of $185,000 in 1924. The Board of Tax Appeals sustained the Commissioner's determination to treat these amounts as taxable income to the trust, in the same manner as the income from which dividends are paid by a corporation to its stockholders is taxable to the corporation.

Monrovia No. 2 Oil Company v. Commissioner, No. 7510.

In essential respects the facts in this case are almost identical with the one preceding. Lawler transferred an oil lease on similar property, and drew up a declaration of trust differing from the earlier one only in that 2,800 certificates of beneficial interest at the face value of $100 each were provided for. Again, but a single

well was drilled, and the entire output sold in advance. No certificates of beneficial interest were ever issued, but 2,800 transferable participating oil agreements were sold at a value of $100 each with no classification of preferred or common. Of these agreements, 800 were given to Lawler in exchange for the lease and the remainder taken up by the public for cash. Each agreement gave the holder thereof a proportionate share in the net proceeds of the sale of the oil and gas, after 30 per cent. had been rendered the lessor of the property.

In 1924, the sum of $121,800 was distributed to the holders of the participating agreements, and in 1925 the sum of $172,621.67. As in the former case, the Board of Tax Appeals ruled that the trust together with the holders of the participating agreements was an association within the meaning of the pertinent sections of the applicable revenue acts, and that the income from which the payments were distributed was taxable to the trust.

The question before us on these appeals is whether the oil lessees and the participating agreement holders were sufficiently associated to be taxable as corporations. Appellants contend:

1. That the organizations were not taxable as associations because, there having been practically no certificates of beneficial interest issued, what appeared to be a trust was in reality a business carried on by Lawler, and one or two associates; the participating agreement holders being in no way associated inter sese, and with the "trusts" only as arm's length contractors. In this view, payments made to the agreement holders were in no sense dividends, but, like the usual discharge of current contract obligations, "ordinary and necessary expenses" and so deductible from gross income under section 214, Revenue Acts of 1921, 1924, and 1926 (42 Stat. 239; 43 Stat. 269; 44 Stat. 26).

2. It is further contended that even though the concerns in question be properly denominated "associations," yet the holders of the participating agreements cannot be considered members thereof. It is pointed out, as above, that their relationship is purely contractual; that they have no estate in the oil properties save a security interest; that they exercise no control whatsoever. Payments to them, therefore, are nothing but current business expenses, deductible under section 234 of each applicable revenue act (42 Stat. 254; 43 Stat. 283; 44 Stat. 41).

3. Finally, it is suggested, if the trustees and the agreement holders can be said to be associated in any way other than as arm's length contractors, the relationship must be that of trustee and cestui que trust, with the latter exercising no control over the management, being merely passive parties with no function other than receiving payments. Hence, it is argued, the trustees are taxable as fiduciaries, and entitled to deduct from the trust income payments made to the cestuis. Section 219, Revenue Acts 1921, 1924, 1926 (42 Stat. 246; 43 Stat. 275; 44 Stat. 32).

[1] Obviously, if the trustees and the agreement holders in each of these cases combine to make up an "association" within the meaning of section 2 (2) of the Revenue Act of 1921, it is unnecessary to consider whether the trust organization minus the agreement holders would be such.

That such a combination is an "association" taxable as a corporation we deem settled by the decision of the Supreme Court in Hecht v. Malley, 265 U.S. 144, 157, 44 S.Ct. 462, 68 L.Ed. 949, and two cases from this circuit, recently decided by the Supreme Court: Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 295, 80 L.Ed. ——; Helvering v. Combs, 296 U.S. 365, 56 S.Ct. 287, 288, 80 L.Ed. ——. See, also, Swanson v. Commissioner, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. ——, and Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. ——.

The first two contentions advanced by the petitioners are, in substance, that regardless of whether the concerns in question were "associations" within the taxing statutes, the agreement holders could not be considered "associates." Their third contention is that if the agreement holders are associates for any purpose, they must be considered beneficiaries of a trust and that hence payments to them must be deducted as fiduciary distributions.

All these contentions are addressed to the single question in the case which is whether the companies, together with the agreement holders, are "associations" within the definition given that term by the Supreme Court decisions. In the determination of that question it is of no importance that the distributees of the payments were called "participating agreement holders" rather than "shareholders" or "benefi-

ciaries." As was said in Morrissey v. Commissioner, supra: "While the use of corporate forms may furnish persuasive evidence of the existence of an association, the absence of particular forms, or of the usual terminology of corporations, cannot be regarded as decisive. * * * The test of an association is not to be found in the mere formal evidence of interests or in a particular method of transfer."

The Combs Case, supra, involved an oil trust similar to those in the cases here. In that case, as in each of these, but one well was drilled. In the Combs Case, however, the beneficial interest in the enterprise was limited to .71333 per cent. of gross production. Other than the organizers, only thirteen persons contributed funds to the enterprise, and divided among themselves only 25 per cent. of gross production after the deduction of trust expenses. In the cases before us, the aggregate participating agreements amounted to 66⅔ and 70 per cent. of net production respectively. In the first appeal (Monrovia Oil Company) over 50 per cent. of this beneficial interest was shared by some 200 members of the public; in the Monrovia No. 2 Company appeal, over 70 per cent. of the participating interest was acquired by an unspecified number of the public.

It is obvious that the cases at bar resemble corporate enterprises to a greater degree than did the Combs oil project, yet the Supreme Court held the Combs organization taxable as an association.

In that case, and in the Morrissey Case, it was urged, as it has been urged here, that the absence of control by the "beneficiaries" over the trust managers rendered the enterprise so far noncorporative as to make it nontaxable as an "association." In rejecting this contention in the Combs Case, the Supreme Court stressed the governing factors as follows: "In considering whether an association was created, the fact that the beneficiaries did not exercise control is not determinative. Hecht v. Malley; 265 U.S. 144, 44 S.Ct. 462, 68 L. Ed. 949; Morrissey v. Commissioner, supra. The parties joined in a common enterprise for the transaction of business, and the beneficiaries who contributed money for that purpose became associated in the enterprise according to the terms of the arrangement. The essential features of the enterprise were not affected by the fact that the parties confined their operations to one oil well. See Swanson v. Commissioner, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. ——, decided this day. Parties may form an association for a small business as well as for a large one. Here, through the medium of a trust the parties secured centralized management of their enterprise, and its continuity during the trust term without termination or interruption by death or changes in the ownership of interests, and with limited liability and transferable beneficial interests evidenced by certificates. Entering into a joint undertaking they avoided the characteristic responsibilities of partners and secured advantages analogous to those which pertain to corporate organization. The fact that meetings were not held or that particular forms of corporate procedure were absent is not controlling. Morrissey v. Commissioner, supra."

Affirmed.