## COMMISSIONER OF INTERNAL REVENUE v. GERSTLE.

### No. 8426.

Circuit Court of Appeals, Ninth Circuit.

March 25, 1938.

James W. Morris, Asst. Atty. Gen., and Sewall Key, J. Louis Monarch, Louise Foster, and M. Leo Looney, Jr., Sp. Assts. to Atty. Gen., for petitioner.

Francis W. Murphy, of San Francisco, Cal., for respondent.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

This case was brought here on petition to review a decision of the Board of Tax Appeals. The question presented is whether the respondent is entitled to deduct for income tax purposes his proportionate share of operating losses sustained by syndicates of which he was a member. Specifically, it is whether the syndicates are associations within the meaning of section 2(a) (2) of the Revenue Act of 1926, and section 701 (a) (2) of the Revenue Act of 1928, 26 U. S.C.A. § 1696(3), providing that for the purposes of the act "the term 'corporation' includes associations, joint-stock companies, and insurance companies"; or whether, as contended by respondent and as held by the Board, the syndicates are joint ventures. If the latter, the members are taxable as individuals and have the right to deduct each year their proportionate share of the operating losses of the syndicates. If the syndicates are associations, and therefore taxable entities, their losses are personal to them and cannot be deducted by any one else.

Income taxes for the years 1927, 1928, and 1929 are involved. The material facts are stipulated and disclose the following situation: For many years prior to 1927 the respondent and the several other members of the syndicates involved had been directors of corporations owning large department stores in San Francisco and Oakland. In 1927 it was decided to build a new store in Oakland some blocks away from the then business district. The respondent and his associates decided to purchase properties in the immediate vicinity of the proposed new store in order that they might realize profits from an expected increase in value of the neighboring real estate. The original plan was expanded somewhat to include the purchase of other properties in Oakland in anticipation of a general rise in real estate values. Four syndicates in all were organized within a few weeks of each other, the members contributing to a pool to be used for the purchase of the properties thereafter acquired. At the outset it was their purpose to purchase certain properties which they believed could be quickly resold at a profit. It was not then the purpose to improve any of the properties acquired. The management of the properties was intended to be such only as would be necessarily incident to the ownership in the interim between purchase and anticipated sale.

The syndicate agreements were made in writing by three syndicate managers and those who affixed their signatures as members. All four agreements are identical in form. It was recited that the syndicate members are desirous of acting jointly in the purchase, management, and sale of real properties in Oakland, and for that purpose have requested the syndicate managers to act as their agents and trustees. The parties agreed that the managers should purchase, manage, and sell the real properties for the account of the members, the managers to have complete discretion in the selection of the properties to be purchased, the amount of the purchase price, the de-

tails of management, the terms of sale and of mortgage, and of all other matters related to the syndicate operations. The properties purchased might be taken in any names the managers might determine. It was provided that each member on executing the agreement should set down after his name the amount he would contribute to the operations, "and his interest in the properties, profits, obligations, debts and losses of the syndicate shall be that proportion thereof which the amount set after his signature bears to the total of the amounts set after the signatures of all the syndicate members." It was agreed that the funds required for the operations of the syndicate should be provided by the members, who were to pay to the managers, on call, their respective proportions of the total sum called for, "provided that no syndicate member shall be called upon, prior to the termination of the syndicate, to pay a greater aggregate amount than that set after his signature hereto." The managers were empowered to borrow money in their own names or in the names of others for the benefit of the syndicate, and the members were liable for the repayment thereof in proportion to their respective interests. The managers, who might act by majority, were not to be responsible for any act performed in good faith, and were to be indemnified and held harmless by the members from any loss or liability that they might be subjected to. In the event of vacancies, successors to syndicate managers might be appointed by the members. The managers were entitled to compensation under certain conditions. The syndicate might be terminated by the managers or by members holding at least two-thirds of the beneficial interest, and upon termination the syndicate property was to be delivered to the members in their proper proportions, and if there should be a loss, each member was required forthwith to pay his proper proportion to the managers. No assignment by a syndicate member of his interest could be made effective until written notice thereof had been delivered to the managers, "nor shall any assignment release the syndicate member so assigning from liability hereunder unless the syndicate managers shall so agree in writing." The agreements were to be executed in any number of counterparts, each constituting a single agreement. No certificates or other evidence of interest were provided for in the agreement, nor were any ever issued.

Syndicate No. 1 was the original syndicate, through which six properties were purchased. The purpose of syndicate No. 2 was the purchase and resale of St. Mary's College property. Syndicate No. 3 acquired two properties, and syndicate No. 4 was formed to acquire what is called the Gross property. No other properties were purchased.

The anticipated rise in values did not occur. There was instead a decline which continued throughout the subsequent years. By reason of these circumstances, the syndicate managers were compelled to operate certain of the buildings and to rent the remaining unimproved properties, these latter being temporarily appropriated for a variety of purposes. Prior to 1930, two properties only were resold, the remainder in the latter year being transferred to corporations.

At the commencement of the operations an arrangement was made with a bank to provide the funds originally required for the purchase of the several properties, these funds being advanced on the notes of the syndicate managers. The acquisitions were made on the recommendation of the bank and a firm of real estate brokers in Oakland. Believing that a disclosure of the identities of the real parties in interest would result in an immediate increase in prices, precautions were taken to conceal the identities of the members of the syndicate. Accordingly, title to all properties was taken in the name of one or the other of two title companies.

The syndicates, as such, had no name. There were no officers except as the managers might be so considered. The agreements provided the sole evidence of the interest of the several members, and each member received an executed counterpart. While the agreements gave the managers broad and exclusive powers, the practice was to decide all questions of importance only after the views of all concerned had been obtained. The managers did not organize. The bank, as fiscal agent, kept all records pertaining to syndicate affairs. It rented the improved properties, collected the rents, and paid all expenses. From time to time the syndicate members were called upon to supply funds to the bank proportionate to their respective subscriptions. The funds advanced by the bank on the notes of the syndicate managers, both for the acquisition and subsequent maintenance

of the properties, were repaid directly to the bank by the members on calls prepared and issued by the bank directly to the members. As security for the repayment of advances, the bank held declarations of trust covering the syndicate assets executed. by the title companies—the holders of the record title—these declarations of trust being executed with the consent of the managers. The bank was compensated for the services rendered by it.

Large operating losses were sustained by the syndicates during the years in question. The members deducted on their individual returns for those years their respective proportions of the losses, and these were disallowed by the Commissioner. The Board disagreed with the Commissioner, holding that the syndicates were not associations taxable as corporations, and that operating losses were allowable to the members.

In Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 295, 80 L.Ed. 263,[1] the court, after reviewing the decisions in Crocker v. Malley, 249 U.S. 223, 39 S.Ct. 270, 63 L.Ed. 573, 2 A.L.R. 1601; and Hecht v. Malley, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949, said: "While it is impossible in the nature of things to translate the statutory concept of 'association' into a particularity of detail that would fix the status of every sort of enterprise or organization which ingenuity may create, the recurring disputes emphasize the need of a further examination of the congressional intent." Definitions ·of the term "association" showing the ordinary meaning of the term as "applicable to a body of persons united without a charter 'but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise,'" were there said to be helpful, but not to be accepted to the extent of making mere formal procedure a controlling test. "While the use of corporate forms may furnish persuasive evidence of the existence of an association, the absence of particular forms, or of the usual terminology of corporations, cannot be regarded as decisive." Again, it is said that "the inclusion of associations with corporations implies resemblance; but it is resemblance and not identity." Certain salient features of corporate organization, as furnishing analogies, are pointed out by the court. Thus it is said, in substance, that a corporation, as an entity, holds the title to the property embarked in the undertaking; it furnishes centralized management through representatives; it insures continuity of enterprise; it facilitates the transfer of beneficial interests and the introduction of large numbers of participants; and it permits the limitation of personal liability of participants to the property embarked in the undertaking.

Certain of these features were present in the syndicates involved. While title to the assets was not taken in. the supposed entity or in the syndicate managers, continuity of the enterprise was effected, insuring against disturbance resulting from death or from the transfer of ownership of beneficial interests. Centralized management was provided for in the agreements, notwithstanding in practice there was general consultation before important decisions were reached. See Helvering v. Coleman-Gilbert Associates, supra, note. In other respects, these syndicates lack analogy to corporations. Two of the characteristic advantages of corporate organization have been generally thought to be the limited liability of the members, and a ready divisibility and transferability of beneficial interests, making toward the inclusion in the enterprise of large numbers of participants. The liability of the syndicate members was not limited. Their beneficial interests were not readily or conveniently transferable. There were no shares, certificates, or other evidence of interest beyond each member's copy of the agreement. While, in a few instances, divisions were made of their interest by members, orally or in writing, those acquiring proportionate shares of the interest of these members· were never consulted, and no calls were ever made upon them. Their relations were entirely with the member with whom they had originally dealt and from whom their respective interests were acquired. While, as was said in Morrissey v. Commissioner, supra, "the test of an association is not to be found in the mere formal evidence of interests or in a particular method of transfer," yet the absence of familiar provision

[1] And see the cases immediately following: Swanson v. Commissioner, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273; Helvering v. Combs, 296 U.S. 365, 56 S.Ct. 287, 80 L.Ed. 275; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S. Ct. 285, 80 L.Ed. 278.

for adequate evidence of interest or of any convenient method of transfer is important to be considered.

In A. A. Lewis & Co. v. Commissioner, 301 U.S. 385, 57 S.Ct. 799, 801, 81 L.Ed. 1174, it was said that the trust reviewed in Morrissey v. Commissioner, supra, "was a medium for the carrying on of a business enterprise by the trustees and participation in the profits by numerous beneficiaries whose interests were represented by transferable share certificates, thus permitting the introduction of new participants without affecting the continuity of the plan. The certificates represented both preferred and common shares. We pointed out that the corporate analogy was evidenced by centralized control, continuity and limited liability, as well as by the issue of transferable certificates."

An attempted analysis of the character and functions of the syndicates here involved leads to no entirely satisfying conclusion as to what they are. In some respects they resemble partnerships, in others corporations, and in the main they are markedly different from either. The Board held that they were joint ventures, citing the definition of such given in 33 C.J. 841 as "a special combination of two or more persons, where, in some specific venture, a profit is jointly sought, without actual partnership or corporate designation." It was thought by the Board that the assets acquired through the syndicate activities were the property of the members, as tenants in common, citing McCausey v. Burnet, 60 App. D.C. 201, 50 F.2d 491, and Clark v. Sidway, 142 U.S. 682, 12 S.Ct. 327, 35 L.Ed. 1157. It seems clear that the members were equitable owners of the real property acquired, and that their beneficial interests were not merely personal claims against the syndicate managers.

· No useful purpose would be served by further review of the many authorities dealing with various aspects of this difficult subject. Attention will be called only to two recent cases involving opposite sets of facts and illustrating the views that have been taken following on the decision of Morrissey v. Commissioner, supra. These are Monrovia Oil Co. v. Commissioner, 9 Cir., 83 F.2d 417, decided by this court, and Myers v. Commissioner, 89 F.2d 86, decided by the Circuit Court of Appeals for the 7th Circuit.

We hold that the syndicates were not associations within the meaning of the applicable statute, and the decision of the Board is therefore affirmed.

DENMAN, Circuit Judge.

I concur on the ground that whatever may be the form of the syndicate agreements, they did not control after the frustration of the plan for immediate resale and the transactions under which the losses were sustained were conducted in a manner of direct participancy of the taxpayers.