L. H. STIERWALT and Helen H. Stierwalt, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 4218.

United States District Court
D. Wyoming.

March 9, 1960.

Loomis, Lazear & Wilson, Cheyenne, Wyo., and Holland & Hart, Denver, Colo., for plaintiffs.

John F. Raper, Jr., U. S. Atty., Cheyenne, Wyo., and Jack F. Blair, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

KERR, District Judge.

The sole question presented by this action is whether the original Declaration of Trust and subsequent agreements entered into by Stierwalt, McKibbon and Van Buskirk make them an "association" taxable as a corporation within the meaning of 26 U.S.C.A. § 7701, Internal Revenue Code of 1954.

There is no uncertainty in the principles of law to be followed by the courts since the decision of Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263. The difficulty, as always, comes when the Court applies a principle of law to a given state of facts. Under the Morrissey decision the decisive factor is whether the trust is an orthodox or pure trust as distinguished from a business trust or "association". The court states at page 347 of 296 U.S., at page 290 of 56 S.Ct.:

> "We granted certiorari because of a conflict of decisions as to the distinction between an 'association' and a 'pure trust', the decisions being described in one of the cases as 'seemingly in a hopeless state of confusion.'"

The Ninth Circuit in Porter v. Commissioner, 130 F.2d 276, has stated there are two tests to be applied to a trust in order to determine whether or not it is taxable as a corporation. (1) What is its purpose? (2) What is the extent of its business?

In Fidelity-Bankers Trust Co. v. Helvering, 72 App.D.C. 1, 113 F.2d 14, on page 17 there appears a statement of law on this subject well worth repeating:

> "We are concerned here with a trust. Taxability as an association or corporation no longer turns on technical differences in organizational structure nor on the degree of control given to beneficiaries in management of trust affairs. Simulation by unincorporated organizations of corporate forms and approximation of corporate advantages by skillful use of trust and contract devices have brought legislative classification with technical corporations for taxation and other purposes, and like action independently by courts. But not all trusts are taxable as corporations. Under the pertinent statutes only those engaged in doing business for profit or income are so taxed. A trust does not engage in business, for purposes of the tax, if its sole or principal object and activities are: (1) preservation of specified property; (2) liquidation of a trust estate; (3) distribution of income derived from another source. Clearly the same rule should apply if its function is exclusively to service the security for a loan. The ultimate question is whether the trust performs some nonbusiness function of this sort or operates a business enterprise as a going concern."

Having stated the principle of law involved I will now turn to the facts of the case and attempt to determine how they square with the decided cases on the subject.

The facts are not in dispute. The taxpayers, L. H. Stierwalt and his wife Helen, have sued to recover $803.48 of taxes and interest representing an assessment made after the Commissioner had disallowed their claimed deduction for intangible drilling expense. The Commissioner took the position that the deduction was available only to Stierwalt, McKibbon & Associates, which, in his view, is an association taxable as a corporation within the meaning of 26 U.S. C.A. § 7701, Internal Revenue Code of 1954.

In the summer of 1953 several people living in Worland, Wyoming, became interested in participating financially in oil and gas developments near Newcastle, Wyoming. They requested L. H. Stierwalt, who had some experience in the oil and gas business, to investigate the mat-

ter for them. Shortly thereafter, Stierwalt and McKibbon made arrangements for taking oil and gas leases on lands near Newcastle owned by two separate groups of individuals. The leases taken were known as the Dixon and Wrench leases and were executed on August 31, 1953, and November 7, 1953, respectively. The next act on their part was to have a Worland attorney draft the necessary documents to effectuate the parties' plan of having Stierwalt, McKibbon and Van Buskirk conduct the business of developing the aforesaid leases on behalf of the many individuals who were interested only in investing money with the hope of making a profit. The attorney chose a trust device and the three above named persons were appointed as trustees to hold in trust the undivided lease interests which had been purchased by the several investors. However, on December 30, 1953, the trust agreement was revoked after the interest holders had learned that the trust method was inappropriate as a means for allowing the investors to individually claim tax deductions for expenses of the venture. Thereafter a system was devised whereby Stierwalt, McKibbon and Van Buskirk, acting jointly, entered into written agreements with each investor wherein they conveyed undivided shares of their interest under the leases to the named individual who in return agreed to make cash payments both for his undivided interest and his share of the initial drilling expense and also to bear his proportionate share of any eventual production costs. These agreements, which contained no termination date were binding on the heirs, successors, and assigns of all the parties thereto, gave to each investor the right to take in kind or to separately dispose of his share of produced oil and gas. Contemporaneous with the execution of his agreement, each investor also signed a power of attorney giving Stierwalt, McKibbon and Van Buskirk or any two of them acting jointly authority to arrange for the development of the leased premises and the production of oil and gas therefrom, to execute operating agreements, to sell the investor's share of the oil and gas, to borrow money for development on the security of production, and in general to transact any business in furtherance of the venture. The powers of attorney were revocable upon the giving of ten days' written notice mailed to Stierwalt.

Immediately after acquiring the Dixon leases, Stierwalt and McKibbon contacted a Mr. Bert Sager, who at that time was Vice President of the Dunbar Drilling Company, and Sager orally agreed that his firm would drill the two wells required by the terms of the Dixon leases in return for a stated cash consideration and a 25% working interest in the properties. This agreement was reduced to writing and signed by the parties on September 28, 1953. At the same time the then owners executed an agreement appointing the Dunbar Drilling Company as the operator of the Dixon leases for the life of those leases, with the qualification, however, that any party could avoid his or its obligations under the agreement by conveying to the other owners all of his or its interest in the leases. This written operating agreement contained many complicated provisions that had not been touched upon in the negotiations between Stierwalt, McKibbon and Sager. There were no written agreements covering drilling and production from the Wrench lease.

In November of 1953 oil was produced from the initial drilling on the Dixon leases, but a purchaser was not found until the latter part of 1954. By that time, however, the gas and oil ratio was so high that the wells were shut-in as directed by the Oil and Gas Conservation Commission of Wyoming. The wells were not reopened until 1956, when a gas purchase contract with the Wyton Oil and Gas Company was executed. In that same year a three-year oil purchase contract was entered into with the Sioux Oil Company.

Stierwalt, in addition to being one of the active managers of the venture, was the holder, along with his wife, of an undivided working interest in the lease

properties and for present purposes is to be considered as being in the same position as any other inactive investor.

The Internal Revenue Code of 1954 has carried forward the policy of taxing "associations" as corporations, but, as has been the case with previous Revenue Acts, no definition of "association" is contained in the 1954 Code. However, a Regulation under the 1939 Code provides in pertinent part:

"The term 'association' is not used in the Internal Revenue Code in any narrow or technical sense. It includes any organization, created for the transaction of designated affairs, or the attainment of some object, which, like a corporation, continues notwithstanding that its members or participants change, and the affairs of which like corporate affairs, are conducted by a single individual, a committee, a board, or some other group, acting in a representative capacity." Internal Revenue Code of 1939, Reg. 118, Sec. 39.3797–2.

The Commissioner has had occasion to construe the above regulation respecting the meaning of the term "association".

"I.T. 3930, supra, treats joint operating agreements commonly entered into between coowners of oil and gas properties as creating associations taxable as corporations under the Internal Revenue Code *only* if such agreements create organizations *with a joint profit objective.* That is, organizations created by such agreements are considered corporations if some person or persons are irrevocably authorized to act in a representative capacity for a fixed or determinable period of time to sell the production from the joint operation for the joint account of two or more of the coowners. * * *" (Emphasis supplied.)

"Association status turns upon the existence of such collective irrevocable representative capacity. * * *"

"A coowner who reserves the right to take his share of the production in kind, or to direct its sale, may contract to sell or grant options to purchase his share as he sees fit without creating an association taxable as a corporation for Federal income tax purposes. * * *"

"It seems equally clear that one coowner may authorize a person or persons (so long as that person or persons is not another coowner who is also selling his share of the production) to sell his individual share of the production, or to grant options as respects such share, without creating an association taxable as a corporation. * * * However, under I.T. 3930, the same representative or representatives may not act for more than one of the coowners (including himself) without creating an association taxable as a corporation as respects the coowners so represented, unless such authorization is for the time being only (i e., revocable at will), because, in such a case, collective irrevocable representative capacity indicative of an organization with a joint profit objective would be present. * * *"

"* * * As an association, like a formal corporation, may be organized for a short as well as a long period of time, revocable representative capacity must be terminable at will to avoid the formation of an association with a joint profit objective. * * * Accordingly, discretionary authority terminable at will granted to a person or persons representing two or more coowners to enter into contracts committing the principals for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but not to exceed one year, will not be regarded as inconsistent with revocable representative capacity in the sense that the term is used herein and in I.T. 3930. * * *" I.R.Bulletin 1949–1. Chapter 38—Miscellaneous provisions. Pages 161, 162, 163.

The leading case on the question of what characteristics will cause a business organization to be taxable as an association is Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263. In addition to emphasizing the element of centralized management, as is also done in the above quoted Regulation, the court made clear that centralization of management must continue throughout the life of the organization before there can be a finding of corporate resemblance. In discussing the factor of centralized management, the court states:

> "* * * Corporate organization furnishes the opportunity for a centralized management through representatives of the members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise,—who act 'in much the same manner as directors'—may provide a similar scheme, with corresponding effectiveness. Whether the trustees are named in the trust instrument with power to select successors, so as to constitute a self-perpetuating body, or are selected by, or with the advice of, those beneficially interested in the undertaking, centralization of management analogous to that of corporate activities may be achieved." 296 U.S. at page 359, 56 S.Ct. at page 296.

And see Helvering v. Combs, 296 U.S. 365, 56 S.Ct. 287, 80 L.Ed. 275; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278. Cases from this Circuit also have spelled out the requirement that before an organization can be taxed as a corporation it must be a continuing entity. Cooper v. Commissioner of Internal Revenue, 10 Cir., 262 F.2d 530; Mullendore Trust Co. v. United States, 10 Cir., 271 F.2d 748; Fletcher v. Clark, 10 Cir., 150 F.2d 239, 166 A.L.R. 1456; Titus v. United States, 10 Cir., 150 F.2d 508, 162 A.L.R. 991; Commissioner of Internal Revenue v. City National Bank & Trust Co., 10 Cir., 142 F.2d 771; Commissioner of Internal Revenue v. Nebo Oil Co., Trust, 10 Cir., 126 F.2d 148; Hamilton Depositors Corp. v. Nicholas, 10 Cir., 111 F.2d 385; Ross Lewis Trust v. Commissioner of Internal Revenue, 10 Cir., 110 F.2d 937.

There could hardly be any room for dispute as to the necessity for a centralized system of management in a business organization before it can be compared to a corporation. While some corporate attributes, such as limited liability of the owners, have been held unessential for taxation of an association as a corporation, no case has been found where a business organization without a scheme of continuing centralized management has been so taxed. In the present case the powers of attorney, which were revocable upon ten days' notice, and not the contemporaneously executed written agreements, established the plan of central management. The written agreements, although making reference to future production insofar as providing for the prorating of the costs of such production, were concerned primarily with assigning partial interests to the individual investors and with providing a means for financing and operating the initial drilling which had to be done to keep the leases alive. The powers of attorney, on the other hand, actually created a plan of centralized management applicable to the entire oil venture. The powers accomplished this by authorizing any two of the appointed agents to arrange for complete development of the properties by executing operating agreements, borrowing money, selling oil and gas produced from the lands, and in general by transacting "all and every kind of business whatsoever nature and kind in connection with said leased land". And, while it is clear that the executed powers of attorney were actually the creative source for the system of centralized management, it is also clear that these instruments made no provision for the continuation of that form of management throughout the period of the venture. There was no provision made for the choosing of successors to the three appointed agents, nor was there any assurance that the several investors

would continue to leave the affairs of the venture in the hands of those three representatives.

■ The United States contends that the operating agreement entered into with the Dunbar Drilling Company furnishes the necessary elements of corporate resemblance. It is true that there are two Revenue rulings (I.T. 3930, C.B. 1948–2, p. 126, and I.T. 3948, C.B. 1949–1, p. 161. See also 7 Mertens, Law of Federal Income Taxation, § 38 A. 23) which suggest that where the coowners of an oil and gas venture have irrevocably left the development and marketing functions to an independent operator, then there is a resulting association taxable as a corporation. The basis for these rulings is presumably that under such an arrangement there is a continuing centralization of management with the only interest of the coowners being that of participating in the earnings of the venture. Without passing on these rulings, it is sufficient to say that in this case neither the development nor the marketing function was placed exclusively in the hands of an independent operator. Although the written operating agreement, entered into with the Dunbar Drilling Company and affecting only the Dixon leases, purported to designate these functions to Dunbar, the parties to the written agreement consistently departed from its terms. Each of the two oil or gas purchase agreements was executed by the three appointed agents and another oral oil sales contract was arranged by them. It does appear that Dunbar Drilling Company performed all the well drilling, but that fact alone, even under the test of the two rulings, does not establish the necessary corporate resemblance.

■ This case is not without its difficulties but a study of the documents, together with the testimony, persuades me to the belief that all the parties involved, including the individual investors, the three appointed agents, and the Dunbar Drilling Company, contemplated that important management functions would be left to Stierwalt, McKibbon and Van Buskirk. No provision was made for the continuing performance of these functions by any limited group or entity. It follows that a basic corporate attribute was missing in the general organizational scheme of the venture and that under the facts of this case the Association was not such as to give it a status as being taxable as a corporation.

Counsel for plaintiff are given 20 days from this date within which time to prepare findings of fact and conclusions of law, together with judgment, in conformity with this memorandum and the clerk will enter an order accordingly.