**UNITED STATES of America,
Appellant,**

v.

**L. H. STIERWALT and Helen H. Stierwalt, Appellees.**

**No. 6503.**

United States Court of Appeals
Tenth Circuit.

March 14, 1961.

Joseph Kovner, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., and John F. Raper, Jr., U. S. Atty., Cheyenne, Wyo., were with him on the brief), for appellant.

James L. White, Denver, Colo. (Holland & Hart, J. Harley Williams, Jr., Denver, Colo., and Loomis, Lazear & Wilson, Cheyenne, Wyo., of counsel, were with him on the brief), for appellees.

Before HUXMAN, PICKETT and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

The sole issue presented by this appeal is whether a business arrangement formed by some seventy individuals, including appellees (taxpayers), is properly taxable as an association within the definitive term "corporation" contained in the Internal Revenue Code of 1954.[1] The case originated as a suit for refund for personal income tax paid as the result of the disallowance by the Commis-

---

1. 26 U.S.C.A. § 7701.

"(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

\* \* \* \* \* \* \*

"(3) Corporation—The term 'corporation' includes associations, joint-stock companies, and insurance companies."

sioner of Internal Revenue of a claimed deduction for intangible drilling costs made upon taxpayers' individual tax return. The trial court granted judgment for the taxpayers, holding the Commissioner to be in error in his contention that the deduction was not available to individual participants in the venture which operated under the name of Stierwalt, McKibbon and Associates.

The facts are not in dispute and we narrate them exactly as did the trial court. 181 F.Supp. 770.

In the summer of 1953 several people living in Worland, Wyoming, became interested in participating financially in oil and gas developments near Newcastle, Wyoming. They requested L. H. Stierwalt, who had some experience in the oil and gas business, to investigate the matter for them. Shortly thereafter, Stierwalt and McKibbon made arrangements for taking oil and gas leases on lands near Newcastle owned by two separate groups of individuals. The leases taken were known as the Dixon and Wrench leases and were executed on August 31, 1953, and November 7, 1953, respectively. The next act on their part was to have a Worland attorney draft the necessary documents to effectuate the parties' plan of having Stierwalt, McKibbon and Van Buskirk conduct the business of developing the aforesaid leases on behalf of the many individuals who were interested only in investing money with the hope of making a profit. The attorney chose a trust device and the three above named persons were appointed as trustees to hold in trust the undivided lease interests which had been purchased by the several investors. However, on December 30, 1953, the trust agreement was revoked after the interest holders had learned that the trust method was inappropriate as a means for allowing the investors to individually claim tax deductions for expenses of the venture. Thereafter a system was devised whereby Stierwalt, McKibbon and Van Buskirk, acting jointly, entered into written agreements with each investor wherein they conveyed undivided shares of their interest under the leases to the named individual who in return agreed to make cash payments both for his undivided interest and his share of the initial drilling expense and also to bear his proportionate share of any eventual production costs. These agreements, which contained no termination date were binding on the heirs, successors, and assigns of all the parties thereto, gave to each investor the right to take in kind or to separately dispose of his share of produced oil and gas. Contemporaneous with the execution of his agreement, each investor also signed a power of attorney giving Stierwalt, McKibbon and Van Buskirk or any two of them acting jointly authority to arrange for the development of the leased premises and the production of oil and gas therefrom, to execute operating agreements, to sell the investor's share of the oil and gas, to borrow money for development on the security of production, and in general to transact any business in furtherance of the venture. The powers of attorney were revocable upon the giving of ten days' written notice mailed to Stierwalt.

Immediately after acquiring the Dixon leases, Stierwalt and McKibbon contacted a Mr. Bert Sager, who at that time was Vice President of the Dunbar Drilling Company, and Sager orally agreed that his firm would drill the two wells required by the terms of the Dixon leases in return for a stated cash consideration and a 25% working interest in the properties. This agreement was reduced to writing and signed by the parties on September 28, 1953. At the same time the then owners executed an agreement appointing the Dunbar Drilling Company as the operator of the Dixon leases for the life of those leases, with the qualification, however, that any party could avoid his or its obligations under the agreement by conveying to the other owners all of his or its interest in the leases. This written operating agreement contained many complicated provisions that had not been touched upon in the negotiations between Stierwalt, McKibbon and Sager. There were no written agreements covering

drilling and production from the Wrench lease.

In November of 1953 oil was produced from the initial drilling on the Dixon leases, but a purchaser was not found until the latter part of 1954. By that time, however, the gas and oil ratio was so high that the wells were shut-in as directed by the Oil and Gas Conservation Commission of Wyoming. The wells were not reopened until 1954, when a gas purchase contract with the Wyton Oil and Gas Company was executed. In that same year a three-year oil purchase contract was entered into with the Sioux Oil Company.

Stierwalt, in addition to being one of the active managers of the venture, was the holder, along with his wife, of an undivided working interest in the lease properties and for present purposes is to be considered as being in the same position as any other inactive investor.

We doubt that the lay mind would find much difficulty in concluding from this factual background that the investors were business associates and that an association had been formed. But the legal complexity of the term when faced with the unhappy impact of taxation has defied definition and has led the courts to the necessity of examining each such organizational plan by comparison with standard, orthodox business entities. In such regard the government here points to functional similarities in this "association" and a corporation. The taxpayer emphasizes dissimilarities, functional and otherwise, and asserts the existence of the principal-agent relationship. Both parties claim comfort in the much-considered case of Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263.

The Morrissey case and its companion cases, Swanson v. C. I. R., 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273; Helvering v. Combs, 296 U.S. 365, 56 S.Ct. 287, 80 L.Ed. 275; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278, dealt mainly with the distinction between Massachusetts or business trusts and traditional trusts in their ex-

position of the statute making unincorporated associations taxable as corporations. In accord with these decisions, lower courts have examined varied instruments creating trusts, compared the efficiency of their provisions for offering the advantages of incorporation while avoiding the corporate form, and have generally held such trusts taxable as an entity where the primary purpose of organization was to conduct a business. See Annotations 108 A.L.R. 340, 144 A.L.R. 1050, 166 A.L.R. 1461. The Morrissey case offered examination of certain features of corporate life which could be effectively introduced into an instrument of trust:

"What, then, are the salient features of a trust—when created and maintained as a medium for the carrying on of a business enterprise and sharing its gains—which may be regarded as making it analogous to a corporate organization? A corporation, as an entity, holds the title to the property embarked in the corporate undertaking. Trustees, as a continuing body with provision for succession, may afford a corresponding advantage during the existence of the trust. Corporate organization furnishes the opportunity for a centralized management through representatives of members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise,—who act 'in much the same manner as directors'—may provide a similar scheme with corresponding effectiveness. Whether the trustees are named in the trust instrument with power to select successors, so as to constitute a self-perpetuating body, or are selected by, or with the advice of, those beneficially interested in the undertaking, centralization of management analogous to that of corporate activities may be achieved. An enterprise carried on by means of a trust may be secure from termination or interruption by the death of owners of beneficial interests and

in this respect their interests are distinguished from those of partners and are akin to the interests of members of a corporation. And the trust type of organization facilitates, as does corporate organization, the transfer of beneficial interests without affecting the continuity of the enterprise, and also the introduction of large numbers of participants. The trust method also permits the limitation of the personal liability of participants to the property embarked in the undertaking." 296 U.S. at page 359, 56 S.Ct. at page 296.

The Morrissey case itself held that neither the use of corporate forms, control over management by those beneficially interested, nor the issuance of certificates and their attendant ease of transfer was essential to the existence of an association taxable under the Internal Revenue Code. And the lower courts have subsequently held that lack of a provision limiting personal liability could be disregarded where it was unlikely that such contingency would arise due to the nature of the enterprise, Del Mar Addition v. C. I. R., 5 Cir., 113 F.2d 410; Bert v. Helvering, 67 App.D.C. 340, 92 F.2d 491; Kilgallon v. C. I. R., 7 Cir., 96 F.2d 337; Fletcher v. Clark, 10 Cir., 150 F.2d 239, 166 A.L.R. 1456. Some cases, too, have questioned the importance of the status of legal title to the property subjected to the group purpose, C. I. R. v. City Nat. Bank & Trust Co., 10 Cir., 142 F.2d 771; and in Burk-Waggoner Oil Ass'n v. Hopkins, 269 U.S. 110, 46 S.Ct. 48, 70 L.Ed. 183, the court disregarded the fact that legal title remained in the various associates where unified control was assured. In Thrash Lease Trust v. C. I. R., 9 Cir., 99 F.2d 925, no formal written agreement evidenced the existence of a trust entity nor provided for its continuance as a business operation and yet the court found that the past and present functioning of the group, relying upon the management of two of their number was sufficient to constitute an association within the meaning of the taxing statutes. Numerous other attempts to escape the impact of the Morrissey case through the trust device have likewise discovered the courts more ready to apply its philosophy than to accept technical distinctions. See Monrovia Oil Co. v. C. I. R., 9 Cir., 83 F.2d 417; Helm & Smith Syndicate v. C. I. R., 9 Cir., 136 F.2d 440; Mullendore Trust Co. v. United States, 10 Cir., 271 F.2d 748; C. I. R. v. Nebo Oil Co., Trust, 10 Cir., 126 F.2d 148; United States v. Hill, 10 Cir., 142 F.2d 622; Cooper v. C. I. R., 10 Cir., 262 F.2d 530; 7 Mertens Law of Federal Income Taxation § 38A.14.

The repeated judicial pronouncements rejecting varying trust arrangements as insulation against taxation as a corporation has led to experimentation with a number of other types of organizations. And although it certainly doesn't follow that simple association of a number of persons for an avowed business purpose results in a taxable association, C. I. R. v. Gibbs-Preyer Trusts, 6 Cir., 117 F.2d 619, it is apparent that the doctrine of Morrissey is applicable to business arrangements other than trusts and that the test remains the same—a balancing of the formal and functional aspects, similar and dissimilar, of the arrangement with those of a corporation. The Fifth Circuit in consideration of a syndicate which vested broad powers in the manager of an oil and gas lease of which the individual members owned individual portions determined the arrangement to be sufficiently divorced from corporate form as to be not taxable as an association. C. I. R. v. Horseshoe Lease Syndicate, 110 F.2d 748, certiorari denied Helvering v. Horseshoe Lease Syndicate, 311 U.S. 666, 61 S.Ct. 24, 85 L.Ed. 427. The Sixth Circuit, in reviewing a very similar arrangement, placed importance upon a single distinguishing circumstance, stating in C. I. R. v. Fortney Oil Co., 125 F.2d 995, at page 997:

"* * * each assignee as to his proportionate share assumed not only the obligations contained in the contract with reference to his own

fractional interest, but also assumed 'the obligations and agreements of the Assignees in the certain oil and gas lease covering the acreage herein described.' Under such a provision it is impossible for one assignee to maintain that he is not associated with the other assignees in the common enterprise. It does not appear that any comparable provision was present in Commissioner v. Horseshoe Lease Syndicate, 5 Cir., 110 F.2d 748, certiorari denied Helvering v. Horseshoe Lease Syndicate, 311 U.S. 666, 61 S.Ct. 24, 85 L.Ed. 427, or Commissioner v. Rector & Davidson, 5 Cir., 111 F.2d 332, certiorari denied Helvering v. Rector & Davidson, 311 U.S. 672, 61 S.Ct. 33, 85 L.Ed. 432, on which the respondents rely. It does appear that there was no arrangement in either of those cases to insure continuity of the centralized management. These two features distinguish them from the instant cases."

Administrative regulations,[2] following a pattern similar to case law, have at-tempted to regulate by example and as a result are largely negative in approach.

From the cases cited and the numerous other authorities referred to in the briefs of the parties no clear cut conclusion in the instant case is indicated. It is apparent however that the essence of the venture is a joint investment with the goal of a joint profit; that centralized and continuing management is contemplated and accomplished in fact although no specific provision of the agreement provides for the method of choosing successors in management; that the broad powers granted by the powers of attorney contemplate an authoritative use for the benefit of all investors and in conjunction with identical grants of power from all; that the designation of agency cannot carry with it the true personal consideration usual with such a relationship; that the power of the agent to bind the investor is specifically granted to allow accomplishment for long-term periods; that the technical right of the investor to take production in kind is admittedly impractical in use; that the allowable revocation of the agency after

2. I.T. 3930, C.B. 1948-2 at p. 127: " * * * It thus appears that those group organizations which attain the corporate attributes of centralized management and continuity of life are associations taxable as corporations, but those which do not have such attributes are comprehended by the term 'partnership'. This rule is based upon the proposition that other corporate attributes, arising solely from the concept of separate personality or entity in the corporation, are generally recognized as unattainable by associations and, therefore, immaterial to classification as a corporation, since the statutory definition of the term 'corporation' was manifestly intended to broaden that term to include associations serving a substantially similar function. *Consequently, only continuity of life and centralization of control of group activities, the attributes of the corporate form of organization which may be commonly attained without incorporation are regarded as material*" (Emphasis added.)

And at p. 128: "Manifestly, profits arise not from mere extraction or from the processing of mineral, but from the sale thereof. Accordingly, *it seems* *clear that if the joint objective is limited to a development and the extraction and processing of mineral (at joint cost and expense to be met by contributions of the respective participants) for division in kind or for sale for the accounts of the several participants individually, the test of a joint venture for joint profit is not met* * * * As such agreements commonly allow the participants to take their shares of the mineral in kind or provide for the sale of the shares of the respective participants for their individual accounts under revocable agency powers), *the sale of the mineral, even though made by the operator, is a sale by or on behalf of the individual participants. In such cases there is no joint profit contemplated or realized by the associates* * * *" (Emphasis added.)

And at p. 129: "On the contrary, where agreements irrevocably vest the operator in his representative capacity with the authority to extract and sell the mineral, there are created for income tax purposes associations taxable as corporations * * *"

notice, unless exercised en masse, would not necessarily change the utility of the organization nor its existence as a continuing entity in fact. These factors are similar to those in corporate organization, achieved the economic advantage of a corporation, and, when contrasted with those opposed, seem sufficient to create an association such as is contemplated within the definition of 26 U.S.C.A. § 7701(a) (3).

The judgment is accordingly reversed.