# CHARLESTON.

EDINGER *v.* SOUTHERN OIL COMPANY *et als.*

Submitted June 6, 1910.　Decided March 14, 1911.

1. MINES AND MINERALS—*Mining Partnership—Powers of Partners Owning Majority Interest.*
   Mining partners, owning the majority interest, and controlling

the operations on a mining lease, have no right, without their consent, to sell and convey the interest of their co-partners, or co-lessees, in the lease, or in the product thereof.   (p. 40).

2.   SAME—*Mining Partnership—Accounting.*

But if such managing partners, on obtaining a gas well, in good faith, and for the benefit of all concerned, and for the purpose of obtaining a test of the caliber and persistency of such well, make a temporary agreement with a local gas company, to connect with the well, and take and commingle the gas therefrom with gas from other wells and to sell the same to its customers, at a monthly rental deemed reasonable by them, such managing and controling partners having no interest in the said gas company, or in the profits to be derived by it from the sale of such gas, should not, in accounting with their co-partners for the gas used by them from such gas well, be chargeable with the price which such gas company received, or the value thereof at the point of delivery to its customers, but only for what it actually and in good faith received from the gas company' therefor, and the value of any gas used by them elsewhere, the rules obtaining in general partnerships being properly applicable in such cases.   (p. 42).

(BRANNON, JUDGE, absent.)

Appeal from Circuit Court, Harrison County.

Bill by Henry H. Edinger against the Southern Oil Company and others.   From the decree mentioned defendant appeals.

*Reversed and Rendered.*

*John Bassel, Charles N. Kimball,* and *Eugene Mackey,* for appellant.

*Davis & Davis* for appellee.

MILLER, JUDGE:

Originally plaintiff's right to relief prayed for, or to any relief, was put in issue by the pleadings and proofs; but on this appeal it is conceded that by decree of April 30, 1907, these rights were finally adjudicated, and that the questions here presented must be governed by the principles of that decree.   Thereby it was adjudged and decreed that plaintiff "is the owner of an equal one-eighth part of the working interest in and to all the gas and oil produced from the premises in the bill described, and as such is entitled to an accounting from" the defendants, Southern Oil Company, and Reserve Gas Company, "for any

and all gas used therefrom by them or either of them"; and the cause was thereby also referred to a commissioner to state such an account according to direction given and to report the same to the court.

This appeal is from the final decree below, on said report, and the several exceptions of the parties thereto, pronounced on October 29, 1909, whereby said report was modified and reformed in certain particulars, and thereon as so modified and reformed, it was adjudged and decreed "that the total value of the gas marketed from the well in controversy during the period in suit was $104,733.75; that the cost of such marketing was $8,500.00; that the plaintiff Edinger is entitled in this suit to recover a sum equal to one-eighth of the net value of the gas so marketed; that he is likewise chargeable with $728.60, being his proportionate share of rentals paid, and that there is accordingly due to said Edinger from the defendant Southern Oil Company, as of the 1st day of June, 1902, the sum of $11,300.62"; and whereby it was accordingly further "adjudged, ordered and decreed that the defendant Southern Oil Company do pay to the plaintiff the sum of $16,269.07, with interest thereon from the date of this decree until paid and the costs of this suit."

The gas in controversy was the product of a well on the Thomas Thompson land, in Harrison county, under a lease to the Southern Oil Company, obtained June 6, 1899, but which the decree of April 30, 1907, held subject to the prior contract between the oil company and plaintiff relating to other leases and the operation thereof by said company, dated June 2, 1899.

The parties to said contract, as clearly appears from its terms, contemplated only the discovery of oil and operations of the leases therefor. Wherefore the special provisions mentioning oil. But gas, and not oil, was found in the Thompson well, the first drilled, and the one in controversy. It is urged, however, and correctly no doubt, that the provisions of the contract apply also to gas. It is true as argued that no provision is found specifically providing that the Southern Oil Company shall have power to market the oil. The contract does specifically provide, however, that the oil company shall control the operations and management of the property, and that in the event, the oil company, after drilling the first two wells, in order to protect the leases, shall be required to put down wells faster than

plaintiff can pay for his share of the cost thereof, the oil company agrees to carry the cost thereof, for plaintiff, "the same to be paid for out of the production, which would be coming and payable or deliverable to the interest of said Edinger until such time as the amount of oil or its value shall equal the liability of said Edinger for the cost of his interest so carried." And the first condition of the contract is: "That the said Southern Oil Company, in developing said leases, or any of them for oil, shall as to the first two wells that may be put down upon any one of said leases, or one well on each lease of any. two, shall carry a working interest therein to the extent of one-eighth undivided to the said H. H. Edinger free of compensation or cost to him whatever, with the right to him to take and receive one-eighth of the net production of said well or wells not exceeding two as aforesaid, other than the actual one-eighth cost of operating said wells after they are bored to the producing sand, and producing sand for the purpose of said well unless oil is obtained at a lesser depth shall be bored to what is known in that territory as the fifth sand." This provision clearly contemplates the production of oil only. So little was gas or the production thereof thought of that it is not mentioned in the contract and no provision made for disposing of it, if it should be found.

Shortly after bringing in this gas well on the Thompson farm, in 1900, and after testing it for oil at a still greater depth, on the request or demand of plaintiff without success, the Southern Oil Company, as the uncontradicted evidence shows, in order to get a test of the capacity and persistency of the well, and without other means of doing so, agreed with the Flaggy Meadow Gas Company, a small company, owning some forty miles of pipe, engaged in supplying gas locally to local drillers and operators in the oil field, that it might hitch on to the Thompson well, and temporarily use the gas therefrom. The result was a temporary agreement between the oil company, and the gas company, by which the latter company was to pay the former for the use of the gas used and to be used, one hundred dollars per month while it remained connected with the well, and to furnish the oil company with free gas to drill wells on the Smith farm. This agreement continued in force from February 2, 1900, to February 18, 1902, covering the period from the

time the gas company first began to take gas until it was cut off on the latter date, a period of two years and sixteen days. During that time the gas from the Thompson well was run into the pipe line with gas from numerous other wells owned or controlled by the gas company and in which the oil company had no interest whatever. The value of the gas used by the oil company on the Smith farm is proven to have been $1200.00, and a little gas sold by the oil company after February 18, 1902, to Phoenix and O'Gara, is proven to have brought $700.00. For all the gas sold and so used by the oil company it realized for the gas sold the Flaggy Meadow Gas Company, $2500.00; used on the Smith farm, $1200.00, and sold to Phoenix and O'Gara, $700.00, total $4,400.00.

It is evident from the record that Edinger knew from the beginning of the agreement with the Flaggy Meadow Gas Company, and made no objection thereto. There is some evidence that some time during the summer after the agreement was made he made some complaint to Mowris, in charge for the oil company, that he was not receiving his part of the receipts from the well, evidently referring to the oil company's receipts, for the oil company had no interest in the gas company, or in its receipts, and there is no evidence that Edinger pretended at that time to have any interest in the gas company's receipts, or that he made demand upon it therefor. It was not until after the gas company cut loose from the well in February, 1902, that Edinger began making his demands on the oil company for a share of the amount realized by the gas company, from the sale of the gas to its customers, resulting finally in the institution of this suit, and the decree of April 30, 1907.

The Southern Oil Company does not deny its liability under said decree to account to Edinger for the gas used by it from said Thompson well or the amount realized by it from the sale thereof to the gas company and others, aggregating said sum of $4,400.00, but Edinger claims and the court below has decreed to him an amount equal to one-eighth of the value of 2,056,675,-113 cubic feet, estimated production from the well during the period covered by the contract with the gas company, at five cents per one thousand cubic feet, and a like one-eighth interest in the value of the gas used by the oil company on the Smith farm, and the amount sold Phoenix and O'Gara, less $728.60,

balance due the oil company from Edinger for rentals paid for him on said leases.

The numerous exceptions to the commissioner's report and the several assignments of error present for our decision on this appeal, the single question, what is the correct basis of settlement between the parties under the decree of April 30, 1907, and the law of the contract governing them? Appellant of course contended that the settlement should be made upon the rules and principles governing mining partnerships. It claims· that owning the majority interest in the Thompson well it had the legal right to make the agreement with the gas company, and temporarily dispose of the gas as it did, and should account to Edinger only for what it actually realized from the gas company, and which it used, and what it afterwards sold to others. On the other hand Edinger contends, and the court so·decreed, that the oil company should account to him, for the one-eighth of the net amount which the gas company realized for the gas marketed through its pipe lines, on the principle that the oil company was a wrong doer, in so disposing of the gas without Edinger's consent, and in allowing the gas company to confuse the gas from the Thompson well with gas from other wells, and to sell it without keeping any account of the production, and that whether the oil company be treated as mining partner of Edinger, with controlling interest, or as co-tenant, its liability is the same, the rights and powers of a mining partner only authorizing him "to do what may be necessary and proper for carrying on the business, and control the work, in case all cannot agree, provided the exercise of such power is necessary and proper for carrying on the enterprise for the benefit of all concerned." The oil company does not controvert the latter proposition, and as applicable here, except in so far as its authority may have been enlarged by special contract. The proposition stated is the law of mining partnerships as declared by this Court in *Childers* v. *Neely,* 47 W. Va. 74; *Blackmarr* v. *Williamson,* 57 W. Va. 252; *Kirchner* v. *Smith,* 61 W. Va. 444; *Greenlee* v. *Steelsmith,* 64 W. Va. 353, all in consonance with many decisions of other states, and the leading text-books on the subject, and cited and relied on in the briefs of counsel.

At once we realize we have for decision a very close case, on the question of power to sell the gas. We give no force,

however, to the theories of counsel for Edinger, of fraud or intentional wrong doing on the part of the oil company, or of any of its officers, in disposing of the gas to the gas company. None of them had the slightest interest in the gas company, or the profits realized by it from marketing the gas. They had seven-eighths, Edinger but one-eighth interest to conserve and protect. The officers of the oil company appear to have been successful and experienced operators. They evidently did what they thought they had the right to do and what they thought was for the benefit of all concerned, else they would have been voluntarily sacrificing their own large interests along with those of Edinger, which is inconceivable. Then there is strong evidence that Edinger agreed with Barnsdall, in the presence of Mowris, to release to the oil company his interest in the gas as a consideration for drilling the Thompson well deeper. Their evidence of this fact, and the evidence of other witnesses of Edinger's subsequent admissions, we think, would undoubtedly have prevailed over Edinger's denials, if Barnsdall for the oil company, by mistake, he says, had not in December, 1902, in transferring to Edinger his interest in the Thompson well, omitted to reserve the gas rights.

We entirely agree with the learned counsel for Edinger that the rights of mining partners partake so nearly of the rights of co-tenants that the majority interest, in case of disagreement, would have no right to sell and convey away the interest of a minority holder in a mining lease. Our decisions and the law on that subject would deny such authority. And we entirely agree with counsel, and with *Stone* v. *Marshall Oil Co.*, (Pa.) 65 L. R. A. 219, and *Mining Co.* v. *Mining Co.*, (Col.) 7 Am. St. Rep. 232, cited and relied on by them, that if an assignee of an oil lease, or a mining partner, in order to avoid accounting with his assignor, or with his partner, fraudulently commingles the gas product of a joint well with the product of other wells, without keeping account, or any record of the amount produced, from the joint well, he should be compelled, on the principles applicable in case of fraudulent confusion of goods, to account for the proportionate part of the whole amount of the gas produced and sold, called for by the contract.

In *Stone* v. *Marshall,* the owners of a lease, sublet a part of the leased premises to the Marshall Oil Company, with right to

drill and operate for oil and gas for one year and as much longer as oil and gas should be found in paying quantities, the oil company covenanting to drill four wells within the time stipulated. The stipulation of the assignment relating to the gas was: "It is also agreed that in case gas shall be discovered and conducted off the premises for use or sale, the said parties of the first part in the proportionate interests aforesaid, shall receive one-fourth of the profits thereof above cost bonus of $700.00 to the original lessor." This assignment was duly admitted to record, and notice thereby given to the world of its provisions; binding all subsequent purchasers. The Marshall Oil Company drilling one well, a very strong gas well. It did not utilize the gas but sold it to the Washington Oil Company, another defendant. Thereafter it induced the original lessor to execute a new lease covering his whole farm, and by it and subsequent agreements to reduce the annual rent for gas wells first to $600.00, then to $500.00, and then subleased an additional portion of the farm to the Washington Oil Company. The latter company thereafter transferred the gas to the Taylorstown Natural Gas Company, practically a selling company for it. Later the Marshall Oil Company and the Washington Oil Company drilled other wells on the leased premises, and got gas which they turned into a common pipe line with the gas from the first well and sold and delivered it to pipe line customers and refused to account to the assignors of the Washington Oil Company, according to the contract of that company with them. This was a plain case for the application of the principle, enunciated by the court, based on fraud and the fraudulent confusion of the goods, so as to deprive plaintiffs of their rights. But it does not seem to us we have any such a case presented here. The case cited was originally before the Supreme Court of Pennsylvania, in 1898, and is reported in 188 Pa. St. 602. The principles governing it were then adjudicated. Referring to the provision of the contract reserving a part of the oil and the covenant above quoted, providing for a proportionate share of the profits realized from the sale of the gas the court says, that this provision was the "foundation of the suit." And it is said of the assignment of the plaintiffs to the Marshall Oil Company, containing the said provisions: "It is a sub-sublease, and as such subject to all the

covenants of the original lease," and that the covenants therein were covenants running with the land, binding defendants.

In the case at bar we have no such conditions. There is not a particle of evidence connecting the Southern Oil Company in interest with the gas company, except only in the matter of furnishing gas for drilling on the Smith farm. But no fraud was intended in this. Besides the oil company admits its liability therefor and has been charged with the value of that gas. The sale to the gas company was not intended to defraud plaintiff in any way, but done for the purposes already noted. The oil company had no gas lines, or means of marketing the gas. The gas company was a small local concern, and so far as the evidence shows the only customer to whom the gas could be sold, or who could make the test desired. The evidence shows, however, that its small plant had involved an investment of $50,-000.00. The only way those interested had of marketing the gas, as conditions then existed, was to either build a pipe line or to sell the gas well as a whole. The managing partners thought no doubt that by making a test of the well, was the way of obtaining a purchaser; and in the interest of all concerned, adopted the method complained of. We think this was within the power covered by the contract, if not by the general law controlling mining partners. There is no evidence showing that a better bargain could have been made. If defendant's act was wrongful and fraudulent it was wrong and fraud working no real wrong to him, but hurtful in a degree unheard of to the oil company, if we should allow the decree in Edinger's favor to stand against it. This we cannot consent to do. The amount of this decree, according to the evidence, is twice as much as the whole interest in such a gas well could then have been sold for, as conditions then were, or even now are. The majority had rights to protect as well as Edinger. As was said in *Stone* v. *Marshall Oil Campany,* *supra*. A share of the gas could not like oil be delivered in specie at the well, or elsewhere, the only way of sharing it, being in the proceeds of the sale. We think the oil company had the power to make suitable tests, and that the contract with the gas company was reasonably within their power.

Conceding that the oil company may not have acted with the best judgment in making the contract with the gas com-

pany, we think the law applicable to general partnerships, applicable to the facts· in this case.   That law is that good faith obtaining, the interests of the majority shall not be rendered liable for improvident contracts.   Loss due merely to lack of discretion or judgment, not amounting to negligence or bad faith, will not put the loss all upon the interests of those responsible therefor.   In such cases it must fall on all the partners as a firm.   This doctrine is fully supported by numerous authorities cited and relied on by counsel for appellants. 22 Am. & Eng. Ency. Law, 128; *Snell* v. *DeLand,* 136 Ill. 533; *Bank* v. *Gardner,* 104 Iowa 176; *Charlton* v. *Sloan,* 76 Iowa 288; *Caldwell* v. *Leiber,* 7 Paige Ch. 483; *Peters* v. *McWilliams,* 78 Va. 567.

Our conclusion, already indicated, is that the decree below is erroneous; is based on wrong principles, and should be reversed, set aside and annulled; that in settlement with Edinger appellant Southern Oil Company should be charged with $550.00, an eighth part of $4,400.00, the gross amount realized by it from the sale of gas to the gas company, and other gas used or sold by it, and credited with the balance due it from Edinger, $728.60, leaving a balance in its favor of $178.60, for which it should have a decree against Edinger, with its costs incurred in this Court.   A decree will be entered here in accordance with this finding.

*Reversed and Decree Entered.*