BUSH #1 c/o STONESTREET LANDS CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3686–64. Filed May 26, 1967.

*Philip O. North*, for the petitioner.
*John H. Menzel*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable year 1961 in the amount of $535.20.

---

The principal issue for decision is whether petitioner was an association taxable as a corporation during the years 1960 and 1961. Petitioner filed partnership returns of income for both of the years 1960 and 1961, on which it reported a net loss for 1960 and a net profit for 1961. In his notice of deficiency, respondent determined that petitioner was an association taxable as a corporation for both years, made certain adjustments in the net loss reported by petitioner for the year 1960, allowed the resulting reduced net loss as an operating loss carryover to petitioner in computing petitioner's corporate tax for 1961, and determined that the resulting corporate tax for 1961 was due from petitioner. The adjustments made to the net loss reported by petitioner for 1960 were reduction of the deduction claimed for intangible drilling expense to the amount actually paid by the promoter to have the well drilled rather than the amounts paid by the participants to the promoter for their interests in the well, disallowance of first-year additional depreciation, and capitalization of $600 of the amount claimed for drilling expense allocated by respondent to hauling expense. If we conclude that petitioner was not an association taxable as a corporation it will be unnecessary for us to decide the remaining issues because any losses incurred by petitioner would be deductible by the individual participants in the well, rather than petitioner, and none of them are parties to this proceeding.

FINDINGS OF FACT

Bush #1 is a producing oil and gas well located in Gilmer County, W. Va. The well is drilled to the Weir sand, about 1,900 feet deep. Drilling was started August 25, 1960, and was completed September 21, 1960. Federal partnership returns of income were filed for petitioner for the years 1960 and 1961 with the district director of internal revenue, Parkersburg, W. Va.

Stonestreet Oil & Gas Co. (hereinafter referred to as SOG) is a partnership composed of three brothers, Denzil, O. Vance, and Bernard Stonestreet (hereinafter referred to as Denzil, Vance, and Bernard, respectively) as equal partners. The principal business of SOG is the promotion of oil and gas wells in the area of Spencer, W. Va. It maintains offices in Spencer and Charleston, W. Va., and its business affairs are conducted primarily by Denzil. SOG promoted Bush #1 and Bush #2 wells.

Stonestreet Lands Co. (hereinafter referred to as Lands Co.) is a West Virginia corporation, the stock of which is equally owned by the three Stonestreet brothers. Lands Co. maintains its office at Spencer, W. Va., and its business activities are conducted primarily by Vance. Its business consists of acting as agent for and performing various necessary functions for numerous oil and gas wells in the Spencer

area, as well as for SOG. At the time of this trial Lands Co. was acting as agent for and performing these same functions for about 70 oil and gas wells, of which about 55 had been promoted by SOG and about 15 had been promoted by others. These services consisted primarily of (a) keeping books of account; (b) causing Federal and State tax returns to be filed; (c) receiving and disbursing moneys; (d) furnishing regular accounting summaries to owners; (e) overseeing maintenance of wells; and (f) entering into contracts, including liability insurance contracts, for and in behalf of the owners of the wells. These functions were performed separately for each well; some of them were also performed for SOG.

Stonestreet Drilling Co. (hereinafter referred to as Drilling Co.) is a West Virginia corporation, the stock of which is equally owned by the three Stonestreet brothers. Its principal business is the drilling of oil and gas wells and its activities are conducted primarily by Bernard.

The activities of SOG, Lands Co., and Drilling Co. were conducted separately and the three organizations were separate entities, although the three Stonestreet brothers owned each of them.

On or before May 10, 1960, SOG negotiated with a large number of heirs of Hobart Bush a mineral lease on a 108¾-acre tract of land in Gilmer County, W.Va., and arranged to have Lands Co., as its agent, named as lessee therein. The lease was dated May 10, 1960. Under the terms of the lease, the lessee was not required to pay any rental but the lease was to be canceled if the lessee did not drill a well on the property within 9 months after the lease was signed; and the lessee was also obligated to drill a second well within another 9 months if the first well proved productive. The lessors were to receive a royalty of one-eighth of the oil and one-eighth of the value of the gas produced from the property. Neither SOG nor Lands Co. paid anything else for the lease. SOG originally agreed with the Bush heirs to drill a well to the Injun sand, which is not as deep as the Weir sand, and SOG was to receive $325 for each one thirty-second interest in the well. Before drilling was started, however, it was decided that SOG should drill the well to the Weir sand and receive $400 for each one thirty-second interest. SOG, acting through Denzil, thereupon set about to "stock out"[1] or promote the well by contacting various potential investors

---

[1] "Stocking out" and "stocking-out agreements" are colloquial terms used in the oil and gas industry in West Virginia, particularly in the Spencer area. According to a witness who is an attorney and has been involved in the oil and gas business in the Spencer area for many years, "stocking out" relates to the activities of the promoter in obtaining subscriptions from investors to participate in a well venture, and "stocking-out agreements," or possibly more appropriately "subscription agreements," are agreements entered into between the promoter and investors whereby the investors agree to subscribe certain funds for drilling and equipping the well, and the duties and obligations of the promoter are also set forth. Sometimes these agreements are written and signed by the promoter and investors; but because the terms of these agreements have become so standardized and well known in this area, quite frequently the agreements are oral.

with a view to interesting them in investing in the well. Title to the Bush farm was examined by an attorney, who received for his services a one thirty-second interest in the oil and gas well which was to be drilled on the property.

It was understood by the persons whom Denzil contacted, in accordance with the usual terms of stocking-out agreements in this area, that they would obtain a one thirty-second interest in the well for each $400 they invested; that the $400 per one thirty-second interest was to be paid to SOG to drill a well on the Bush lease, on a "turnkey contract" basis, to the Weir sand; that if the well was drilled for less than the amounts received by SOG from the investors, the excess would represent a profit to the promoter; that if it cost more to drill the well than was received by SOG, SOG would have to bear the additional cost; that if the well was a dry hole SOG would plug the hole at its own expense; and that if the well turned out to be productive each owner of an interest in the well would be assessed his proportionate share of the cost of equipping the well and would receive an assignment of his proportionate undivided interest in the leasehold estate and the well. They also understood that the well would be operated as a partnership. There was no written agreement entered into between the promoter and the investors at the time the well was "stocked out." The above terms, except as to the cost of participating interests and the depth of the well, which varied, were typical of the terms of most oil and gas promotion agreements in the Spencer area and were known to and relied on by most persons promoting and investing in oil and gas wells in the area.

Several of the potential investors contacted by Denzil, consisting of a group of Union Carbide employees who were not familiar with oil and gas operating agreements in West Virginia, took it upon themselves to find out about oil and gas wells generally and to travel to the site of the proposed well on the Bush property on August 13, 1960, prior to making any payment for an interest in the well. They considered that, as partners, they would have to make decisions about the drilling and operation of the well and that no other well could be drilled on the leased property without their consent. The participants also understood that they could sell their interests in the leasehold estate and in the well without the consent of SOG or of Lands Co.[2] Shortly after talking to Denzil they made the requisite investment.

---

[2] Members of the Carbide investment group who were participants made certain before investing in the well that their respective fractional shares in the leasehold and in the well could be sold. By the time of the hearing one member of the investment group had sold his interest. This sale was not deemed to cause the termination of the organization which owned the leasehold and the working interest in the well, regardless of whether the organization was a partnership or an association.

There was some discussion between several of the participants and Denzil about what driller should be chosen to drill Bush #1. Drilling Co. and Raines Drilling Co. were mentioned as possible drillers by Denzil but no decision was reached as to the driller when the participants were first contacted. The participants did not direct that any particular driller was to be chosen; the choice of a driller was later made by SOG as promoter.

Bush #1 well was "stocked out" by SOG in a period of approximately 2 weeks during August of 1960. No advertising materials were used; interests in the well were sold primarily through personal contacts by Denzil. A total of 29 one thirty-second interests were sold to 21 other persons or partnerships, and oral agreements on the above terms were entered into between these investors and SOG, acting through Denzil. The Bush family heirs, who lived outside of West Virginia, acquired about one-third of the ownership interests in the well, the Union Carbide employees acquired about one-fourth of the ownership interests, and the remainder of the 29 one thirty-second interests were acquired by individuals or partnerships in Spencer, Parkersburg, and Charleston, W. Va. As previously mentioned, a one thirty-second interest was assigned to the attorney who checked the title of the Bush farm, and SOG retained a two thirty-seconds interest for itself. As a result, SOG received during 1960 the sum of $11,600 under these agreements for drilling the first well. The investors paid this amount to Lands Co., as agent for SOG.

SOG contracted with Drilling Co. to have the Bush #1 well drilled and Drilling Co. subcontracted the drilling to Raines Drilling Co., which actually drilled the well. SOG paid out $7,742 in 1960 for the drilling of Bush #1 well, which was commenced August 25, 1960, and completed September 21, 1960.

Bush #1 well struck oil and gas, and SOG equipped the well for production at a cost of $13,838.92, or $432.47 per one thirty-second interest therein. SOG directed Lands Co. to send out statements to the owners of the interests in the well for their proportionate shares of the equipage costs. As a result Lands Co. received in 1960, as agent for SOG, $12,541.63 (29 × $432.47) for equipping the well. Thus SOG received $24,141.63 for drilling and equipping the well, and paid out $21,580.92 for that purpose, realizing an apparent cash profit of $2,560.71.

Sometime after the well was completed the owners of the various interests in the well received from Lands Co. an assignment of an undivided interest in the Bush leasehold estate and an undivided working interest in the wells on the property equal to the number of the one thirty-second interests the owners had acquired in the project. No specific payment was made for these assignments.

After Bush #1 well reached the producing stage it was apparent that it would be necessary for the participants, who were widely spread geographically, to appoint an agent or representative to maintain books and records pertaining to the well, to arrange for and/or enter into contracts for the disposition of the production from the well, to oversee the maintenance of the well and pay any expenses incident thereto, to receive payments from the sale of the oil and gas and distribute them to the owners of the working interests, and to prepare or be responsible for the preparation and filing of all reports and tax returns required to be filed with the various administrative and regulatory agencies. It was orally agreed between the various participating interests and Lands Co. that Lands Co. would act as agent for the participants for a fee to be deducted from the gross receipts from the sale of the oil and gas. No formal written agency agreement was entered into between the parties. Lands Co. proceeded to perform the above functions for the participants, which were similar to functions it performed for numerous other oil and gas operations in the area.

Relations between Lands Co. and the individual participants in Bush #1 were on an informal basis with individual participants discussing the operation of the well from time to time with Denzil and Vance. Any business decisions which the participants were called upon to make were discussed with and conveyed orally to Denzil and/or Vance. The participants considered that the ministerial actions to be taken in connection with the well would be performed by the agent in its discretion but that any major management decisions, such as locating and drilling additional wells, making unusual expenditures, etc., would be made only after consultation with the participants, and that the majority in interest would control. The participants were consulted with regard to whom the oil and gas should be sold, with regard to the purchase of a second storage tank for oil, and with regard to the location of the second well drilled on the property in early 1961, known as Bush #2.

The participants also considered that, as partners in the oil and gas ventures, they would also be personally liable for any damages arising out of the operation of the well and they directed the agent, Lands Co., to obtain liability insurance which would protect them in the event such liability arose.

When Bush #1 became a productive well, it was necessary to decide to whom the oil and gas would be sold. The matter was discussed among at least some of the participants and Denzil. Denzil explained to the participants that Hope Natural Gas Co. (hereinafter referred to as Hope; now Consolidated Gas Co.) had pipelines near Bush #1; that Hope was paying the top price of 25 cents per 1,000 cubic feet for gas; and that Hope, which had reserve facilities, could take the entire

production of Bush #1 for 12 months of the year. It was agreed by those discussing the matter that the gas produced by the well would be sold to Hope, and Lands Co. was so advised. There was no objection by any of the participants to this decision.

Under date of October 17, 1960, Lands Co. entered into a written agreement with Hope selling all the natural gas that may be produced from the Bush tract to Hope for 25 cents per 1,000 cubic feet. The agreement was to continue for a term of 1 year, and thereafter until terminated under another provision of the agreement. The agreement appointed Lands Co. as agent for the vendor to whom all reports and payments should be made. While this agreement was executed by Hope and Lands Co. only, Lands Co. was acting as agent for the participants in executing the agreement. At the time this contract was entered into Hope had no gas procurement office as such in the Spencer area and did not inquire into the details of the ownership of a well, but customarily entered into gas-purchasing contracts with agents of wells. It was also customary for Hope to pay the agent for gas purchased, leaving it up to the agent to distribute the proceeds to the persons entitled thereto. Such was done in this instance.

It also became necessary to decide to whom the oil produced by the well would be sold. There were about four companies that bought oil from this area of West Virginia at this time, but they customarily paid the same price for oil at all times. It was difficult to transport oil from this area to the purchasers' plants by rail or by truck, so most of the oil produced in the area left the well by pipeline. Eureka Pipe Line Co. (hereinafter referred to as Eureka) had pipelines in this area and had one near the Bush property. Eureka does not buy or sell oil on its own account but does act as accommodation agent for oil-buying companies. Eureka will not accept for transmission less than all of the oil produced from a given well and does not like to deal directly with the owners of the undivided interests in a well.

However, in customary practice, which was observed in the instant case, Eureka would not accept oil for transport until a division order had been filed certifying that the signers thereof are the owners of all economic interests in the well. Under date of October 18, 1960, SOG filed a division order with Eureka certifying that the persons whose names appeared thereon were "legal owners of Stonestreet Oil & Gas Co. et al. 'George Bush Farm Acct.' " It was stated in this division order that Eureka was authorized to transport oil from the well [3] "and until further notice to credit the crude petroleum so taken into its custody to the undersigned and in the proportions set forth below."

---

[3] This division order was executed prior to the drilling of Bush #2 well and pertained only to oil produced from Bush #1.

The parties whose names appeared on the division order and who were to be credited with shares of petroleum produced from the Bush #1 well included "O. V. STONESTREET, AGENT—'George Bush Farm Acct'—⅛ Roy [4]—STONESTREET OIL & GAS CO. ET AL.—'George Bush Farm Acct'—⅞ths or all W.I. [working interest]—A mining partnership composed of * * * [the names of all the participants holding one thirty-seconds interests]."

The buyer of the petroleum insisted that the division order be circulated among the participants for their signatures. The basis for the division order was the statement required by Eureka which reported the name and address of each participant in the operation of the well.[5] Eureka reported to the buyer the credits of the individual participants. Eureka would not deal with an individual participant if he desired his share of the oil in kind or if he insisted upon a check from the buyer to him personally.[6] The buyer would not issue checks to individual participants either.

Eureka also required that a power of attorney be executed by the participants in the operation of an oil well. Under date of October 18, 1960, the participants executed (or, had their signatures affixed for them) a power of attorney in favor of Lands Co., appointing Lands Co. as their attorney in fact, "First—To sell, transfer and renew oil acceptances and certificates. Second—To sell oil standing to our [the participants] credit on your books, and to draw and transfer orders for oil. Third—To execute orders for division and assignment of well interest." The attorney was also "empowered to transact all business pertaining to the foregoing or arising out of the same, until further written notice."

Also under date of October 18, 1960, Lands Co., as attorney for the participants, executed a standing purchase order authorizing Eureka to transfer to the credit of South Penn Oil Co. (now Pennzoil) all oil run into Eureka's lines from the Bush property for its account, which order could be canceled immediately by either the buyer or seller upon written notice.

South Penn Oil Co. made payment for the oil to Lands Co. as advised by Eureka. Eureka advised the buyer monthly of "oil barrel credits," which information was the basis of the checks issued by the buyer.

Upon receipt of payments from the buyers of the oil and gas produced from Bush #1, Lands Co. paid whatever expenses had been

---

[4] The lessor's one-eighth royalty.

[5] However, Eureka (and presumably the buyer) makes no independent verification of the participants' signatures. Lands Co. signed the names of some participants at their direction.

[6] An officer of Eureka testified that such an individual "could dispose of his share of the oil elsewhere." However, there is evidence that a buyer would not buy any less than the total production of a well, and it would appear that the participants would have had to agree on a buyer.

incurred in connection with the well and leasehold interest, including its own fee, and periodically distributed the balance thereof, together with an accounting of the receipts and disbursements, to the owners of the interests in the well in proportion to their interests therein. Lands Co. also performed the other functions for Bush #1 normally performed by agents for oil and gas operations, as outlined above. The participants in Bush #1 took no part in the day-to-day operations of the well nor in the ministerial activities and decisions pertaining thereto. No meetings of all the participants in Bush #1 were ever held.

Eureka considered each well operation similar to Bush #1 as a mining partnership with the majority of the parties in interest controlling the partnership operations. The formation of Bush #1 was typical of the formation and operation of oil and gas wells in the vicinity of Spencer, W. Va.

In early 1961, another oil and gas well, called Bush #2, was drilled on the Bush lease. The participants in Bush #1 were also participants in Bush #2 and owned interests in Bush #2 in the same proportion as in Bush #1. The decision to drill the second well on the leased property was that of those individuals who owned interests in Bush #1.[7]

ULTIMATE FINDING OF FACT

For the taxable years 1960 and 1961 petitioner was not an association taxable as a corporation.

OPINION

The principal issue is whether petitioner is an association taxable as a corporation. Section 7701(a)(3)[8] defines the term "corporation," as used in the Code, to include "associations," with the result that an "association" is taxable as a corporation. However, the Code nowhere defines the term "association." Section 7701(a)(2) also defines the term "partnership" as including "a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation." These definitions are not very helpful in distinguishing between "associations" and "partnerships."

The leading case of *Morrissey* v. *Commissioner*, 296 U.S. 344 (1935), distinguished trusts which were taxable as associations and ordinary trusts which were not to be considered associations for tax purposes,

---

[7] In all likelihood the consent to drill a second well on the leased property would have had to have been obtained from the participants of Bush #1, regardless of whether the original participants "subscribed" for interests in Bush #2. The original participants held assignments of undivided fractional interests in the leasehold. At any rate, such was the understanding of the participants.

[8] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

and in doing so established some of the basic principles which have also been used in distinguishing partnerships and other organizations, as well as trusts, from associations taxable as corporations. In its opinion in the *Morrissey* case, the Supreme Court said:

The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity. The resemblance points to features distinguishing associations from partnerships as well as from ordinary trusts. * * *

The Court, after pointing out that the corporate form and formal procedures are not the controlling test in determining whether other types of organizations qualify as associations for tax purposes, went on to discuss what salient features of business trusts made them resemble corporations, such as holding title to the property used in the business, centralized management, continuity of life, free transferability of interests, and limitation of liability. On the other hand the Court recognized that most partnerships are set up to conduct a business and that business partnerships were normally taxed as partnerships under the law. Whether a business trust or a partnership was to be taxed as an association was said to depend upon whether the organization had more of the attributes of a corporation than an ordinary trust or a partnership, which must be determined from the facts in each case.

Inasmuch as the law itself provides no definitive language to determine what organizations might qualify as "associations" for tax purposes, the Commissioner of Internal Revenue has ample authority to promulgate regulations and rulings interpreting the statute and laying down guidelines to be used in applying it. *Morrissey* v. *Commissioner*, *supra; John Provence #1 Well*, 37 T.C. 376, affd. 321 F. 2d 840 (C.A. 3). This the Commissioner has attempted to do in his present regulations, sec. 301.7701-1 through 4, Proced. & Admin. Regs., effective for years after 1960.[9]

Section 301.7701-1(b) of the regulations provides that the tests or standards to be used in determining the classification in which an organization belongs for tax purposes are to be determined under the Internal Revenue Code. Paragraph (c) recognizes, however, that local law governs in determining whether the legal relationships which have been established in the formation of an organization are such that those standards are met.

Subsection 2 of section 301.7701 of the regulations states that there are a number of major characteristics ordinarily found in a pure cor-

---

[9] While we have only the year 1961 before us, it is also necessary for our decision to determine whether petitioner was taxable as a corporation for the year 1960, for which year Regs. 118, sec. 39.3797, was effective. Although the present regulations are considerably broader than the preceding regulations, we do not believe the differences would point to a different conclusion on the same set of facts which we have here for both years. Consequently, we will limit our discussion to the presently effective regulations.

poration which, taken together, distinguish it from other organizations. These are said to be (1) associates, (2) an objective to carry on business and divide the gains therefrom, (3) continuity of life, (4) centralization of management, (5) liability limited to corporate property, and (6) free transferability of interests. In addition to these major characteristics other factors may be found which will be significant in determining whether an organization is to be classified as an association, a partnership, or a trust. The presence or absence of these characteristics depends on the facts in each case. Subsection 2 also provides that an unincorporated organization will not be classified as an association unless it has more corporate characteristics than noncorporate characteristics and that, in making this determination, all characteristics common to both organizations, such as associates and an objective to carry on business and divide the profits, in the case of partnerships and corporations, are not to be considered. This part of the regulations goes on to discuss in detail what constitutes most of the major characteristics of a corporation mentioned above.

Despite the rather detailed discussion of the classification of taxpayers contained in the regulations it is still difficult to determine whether a particular organization, unincorporated in form, must be classified as an association for tax purposes. In each case the particular organization involved must be examined carefully with respect to its method of operation, its organization, and the rights, obligations, and liabilities of those associated in it to determine whether it has more characteristics of a corporation than another type of organization. In making this analysis local law is often important in determining the rights and liabilities of the associates; and we believe consideration should also be given to the intentions and agreements of the associates and the practical problems involved in conducting the particular venture in the form desired. This is particularly true in the case of a "mining partnership," which we find the organization here involved to be.

"Mining partnerships" have long been recognized in West Virginia, where the removal and sale of underground minerals has been one of the principal industries for many years. Under West Virginia law a mining partnership is accorded attributes not found in a general partnership, primarily because of the nature of the activities involved; and it is often formed in a manner different than a general partnership. In *Childers* v. *Neely*, 47 W. Va. 70, 34 S.E. 828 (1899), it was said that a mining partnership results from joint ownership and operation of property, not necessarily from a partnership agreement. There is no choice of partners as is present in the ordinary partnership, and no agreement between the parties is necessary. *Wetzel* v. *Jones*, 75 W. Va. 271, 84 S.E. 951. A mining partnership is governed by all the rules applicable to ordinary partnerships except such as flow from the fun-

damental difference in the two associations. *Manufacturers' Light & Heat Co.* v. *Tenant*, 104 W. Va. 221, 139 S.E. 706.

But because of the very nature of the enterprise engaged in and the method by which it is formed, the mining partnership has some attributes which are different from those of the ordinary partnership. Some of these differences were said in *Childers* v. *Neely, supra,* to be: (1) The continuity of life of a mining partnership is not broken by the death or transfer of interest of a partner; (2) the authority of a mining partner to bind all partners is more limited—he cannot borrow money or execute notes binding the partnership without express authority, and he can only bind the partnership for such things as are usual and necessary in the transaction of the particular business; (3) expenditures by and for the partnership are limited to those necessary and usual in the particular business; and (4) members of a mining partnership holding a major portion of the property or property interests have the power to do what may be necessary and proper in carrying on the business and in controlling the work in case of disagreement, provided the exercise of such power is necessary and proper for carrying on the enterprise for the benefit of all concerned.

Respondent has recognized the somewhat unique nature of mining partnerships in I.T. 3930, issued in 1948, 1948-2 C.B. 126, and in I.T. 3948, issued in 1949, 1949-1 C.B. 161. I.T. 3930 dealt with joint operating agreements commonly entered into between coowners of oil and gas properties or leaseholds which, because of the usual terms of such agreements, created mining partnerships. Under such agreements, so the ruling says, an operator, who need not be but generally is a coowner, is designated to take charge of the development and operation of the properties covered by the agreement. In general, such agreements contain the following typical features, among others: (1) Costs of development and expenses of operation are prorated among the parties in accordance with their respective interests; (2) division of the oil proceeds is usually accomplished by payment of the purchase price by the pipeline company or purchaser directly to the several parties according to their shares as indicated in division orders signed by them, although any party might take his share in kind; (3) the parties have voting powers proportionate to their interests to choose and advise the operator on major management functions; (4) any party may sell his interest after giving the others a first option to buy; and (5) the liabilities of the parties are separate and not joint.

The ruling recognizes that such mining partnerships differ from general partnerships principally in that (1) they can arise only between joint operators, (2) they are terminated by exhaustion of the mineral deposit, (3) the majority interest controls policies, and (4)

the death of a participant or transfer of his interest does not terminate the relationship. The law and the cases cited were said to indicate that in order to classify an organization as an association taxable as a corporation there must be (1) associates, (2) continuity of life, (3) centralized control of group affairs, and (4) the object of the organization must be joint profit. Inasmuch as under the usual mining partnership agreement the first three requirements are met, the question to be answered in determining the proper classification of a mining partnership for tax purposes was said to be whether the objective is joint profit. Pointing out that profits of such organizations manifestly arise not from the mere extraction and processing of the mineral, but from the sale thereof, the ruling finds that if the joint objective is limited to the development and extraction of minerals (at joint expense) for division in kind or for sale for the accounts of the several participants individually, the test of joint venture for joint profit is not met. For the reasons stated, the ruling concludes that if in the typical joint operating agreement the participants reserve the right to their shares of the oil in place (or the equivalent, i.e., the right personally to sell or direct the sale thereof for their benefit, or permit the operator to do so for them for the time being) they are partners taxable as such, but if the agreement irrevocably vests in the operator in his representative capacity the authority to extract and sell the mineral, it creates an association taxable as a corporation. I.T. 3930, *supra.*

Advice having been requested of the Commissioner as to the application of I.T. 3930 in cases where contracts were entered into by an agent (of the participants, authorized to act for the time being only) for the sale of oil or gas for periods of time regarded by the industry as minimum commitments under the circumstances, the Commissioner issued I.T. 3948 to clarify the situation. The thrust of that ruling, so far as here pertinent, was that the test of whether an organization operating under the typical mining partnership agreement will be classified as an association for tax purposes depends upon whether, under the agreement, some person or persons are irrevocably authorized to act in a representative capacity for a fixed or determinable period of time to sell the production from the joint operation for the joint account of the coowners. If so, the organization is classified as an association. But a coowner who reserves the right to take his share in kind, or to direct its sale, may contract to sell his share without creating an association; and the fact that some or all of the coowners execute identical contracts, or the same instrument, to sell their shares to the same purchaser does not change this result. Also one coowner may authorize another person to sell his individual share, without creating an association, even though the authorization is irrevocable.

But if the same representative is irrevocably authorized to act for more than one of the coowners in the above respect, the organization will be taxed as an association because in such case the "collective irrevocable representative capacity" indicative of an organization with a joint profit objective would be present. Whether the authority granted is revocable or irrevocable depends primarily on whether it is terminable at will. However, the ruling recognizes that in many oil and gas operations it is necessary to contract for production for a minimum period of time, extending to a year in some cases. "Accordingly, discretionary authority terminable at will granted to a person or persons representing two or more coowners to enter into contracts committing the principals for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but not to exceed one year, will not be regarded as inconsistent with revocable representative capacity in the sense that term is used herein and in I.T. 3930." I.T. 3948, *supra*.

While we are doubtful of the wisdom of trying to apply such technical distinctions to oil and gas operating agreements as they are usually entered into in the area of Spencer, W. Va., particularly oral agreements, nevertheless we do not believe the agreements involved in this case qualify petitioner as an association taxable as a corporation under the above rulings. It is clear that under the agreements by which Bush #1 was organized and operated there were associates and continuity of life, thus satisfying two of the requirements for classification of a mining partnership as an association. While I.T. 3930 assumes that in the typical agreement there is centralized control of group affairs, thus meeting the third requirement, we are not at all sure that the agreements here involved do create centralized management of the group affairs as used in the corporate sense. We will discuss this more in detail later. But as we interpret the oral agreements involved in this case we do not believe they meet the fourth requirement that "the object of the organization must be joint profit," as that requirement is explained in I.T. 3930 and "clarified" in I.T. 3948.

The individual participants in Bush #1 appointed Lands Co. as their agent. These agreements were oral and it would be difficult to determine precisely what the terms of the agreements were. So far as the sale of the product is concerned, the evidence indicates that the various participants were consulted with respect thereto and thereafter they agreed that the gas should be sold to Hope and the oil should be delivered to Eureka for transfer to South Penn Oil Co. to whom it would be sold. This would not appear to be an irrevocable authorization for Lands Co. to act in a representative capacity for a fixed or determinable period of time to sell the production from the joint operation for the joint account of the coowners, as required by the above rulings. It

would appear to be more of an agreement by the individual participants that for the time being the oil and gas should be sold or disposed of as above stated. The evidence indicates that the individual owners reserved the right in the stocking-out agreements to take their prorata shares of the production, or direct its sale, at least so far as the oil was concerned. It is true that as a practical matter all of the gas production had to be sold to the same buyer, as did the oil production. But this does not mean that it was sold for the joint account of the coowners. In fact each participant made his share of the production his own property, and not that of the partnership, by executing the division order for Eureka. *Childers* v. *Neely, supra.*

Furthermore, the authority of Lands Co. to act as agent would appear to have been revocable. The power of attorney executed in favor of Lands Co. under date of October 18, 1960, was to continue only "until further written notice." The agreement for sale of the gas to Hope was to "continue for a term of One year * * *, and thereafter until * * * terminated," a reasonable period of time under the circumstances. The purchase order authorizing Eureka to transfer the oil from the Bush property to South Penn Oil Co. could be canceled immediately by either the buyer or the seller upon written notice. In short the relationship between the coowners of Bush #1 and Lands Co. did not, in our opinion, create in Lands Co. the "collective irrevocable representative capacity" required under the above rulings to qualify petitioner as an association taxable as a corporation.

Possibly this should conclude our inquiry. See Court of Appeals opinion in *John Provence Well #1, supra.* But since the Commissioner's rulings do not have the same authority as his regulations, we will briefly examine the characteristics of petitioner in the light of the regulations and cases relied upon by the parties. Such examination leads us to the same conclusion—that petitioner did not qualify as an association taxable as a corporation in the years here involved.

Of the major characteristics of a "pure" corporation set forth in section 301.7701-2, Proced. & Admin. Regs., petitioner clearly had four of them, being (1) associates, (2) an objective to carry on business and divide the gains therefrom (although not necessarily for joint profit, as discussed above), (3) continuity of life, and (4) free transferability of interests. Having "associates" and an "objective to carry on business and divide the gains therefrom" are common to both corporations and partnerships and should not be considered. Sec. 301.7701-2, Proced. & Admin. Regs. "Continuity of life" and "free transferability of interests" are common to both corporations and "mining partnerships" (although not to ordinary partnerships) and should not be accorded too much consideration in this case. This leaves for consideration the two remaining major characteristics of corporations—

centralization of management and liability limited to corporate property.

In our opinion there was not present in the organizational set up of petitioner the centralization of management characteristic of corporations, which is defined in section 301.7701-2(c) of the regulations as "continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed." As a matter of practical necessity all of the coowners appointed the same agent, Lands Co., to supervise the operation of the well, enter into contracts for the disposition of the production of the well, receive and disburse the proceeds of sale, and handle the other ministerial functions of the organization. But the agent entered into contracts to sell the production to purchasers chosen by the participants, not purchasers chosen by Lands Co. alone or even chosen by the majority in interest. The right to make major management decisions was reserved to the coowners—and they were consulted before such decisions were made. There is no evidence that Lands Co. was appointed permanent agent or that the appointment was irrevocable. The agency relationship was informally established and, presumably, could be nullified at any time by the participants. It is true that in a mining partnership ultimate control lies with the members who own the majority interest. *Edinger* v. *Southern Oil Co.*, 69 W. Va. 34, 71 S.E. 266. However, there are important limitations on the power of the majority. It can be exercised only if it is "necessary and proper for carrying on the enterprise for the benefit of all concerned." *Childers* v. *Neely*, *supra*. And in the *Edinger* case the syllabus by the Supreme Court of Appeals of West Virginia says "Mining partners, owning the majority interests, and controlling the operations on a mining lease, have no right, without their consent, to sell and convey the interests of their co-partners, or co-lessees, in the lease, or in the product thereof."

We conclude that Bush #1 did not possess the corporate attribute of centralized management.

The final corporate attribute for consideration is "liability limited to corporate property." It seems clear that members of a mining partnership do not enjoy security that claims against the partnership are limited to the partnership property and could not be satisfied from a member's individual property. *Manufacturers' Light & Heat Co.* v. *Tenant*, *supra*. Such was the testimony of witnesses familiar with the oil and gas business in Spencer, including a lawyer familiar with the law pertaining thereto. The participants in Bush #1 believed they would be personally liable from claims arising out of the operation of the well, and they directed Lands Co. to purchase liability insurance to protect them from such claims. I.T. 3930, *supra*, says that the liabilities of mining partners are usually separate, not joint. In any event, we find

nothing to indicate that the liabilities of a mining partnership are limited to the property of the partnership.

In addition to the major characteristics of corporations discussed above, we find there are other characteristics of petitioner's organization that differ from the usual corporate characteristics. To mention but a few, title to the property used in the business would normally be held by the corporation, while here the individual participants held undivided interests in the leasehold estate and the well. In this case each coowner appears to have appointed Lands Co. to act as agent individually rather than by vote of the majority. The agent was paid a fee for its services, which would be unusual if the venture was operated like a corporation. Also, unlike a corporation, it is quite doubtful that Lands Co. could be held liable for any act done within the scope of its authority. It also appears that all the net income of the venture was periodically distributed to the coowners without directions or instructions from the coowners. A corporation would usually retain some of the income for working capital.

For the reasons discussed above and for other reasons supported by the record in this case, we have found as a fact that Bush #1 did not have more corporate characteristics than it had noncorporate characteristics in the years involved, and consequently cannot be classified as an association taxable as a corporation for those years.

Respondent relies primarily on *John Provence Well #1, supra,* and *United States* v. *Stierwalt,* 287 F. 2d 855 (C.A. 10), in support of his determination that petitioner should be taxed as a corporation. We think those cases are factually distinguishable from this case and are not controlling here. In *John Provence Well #1, supra,* this Court found that the promoter had not actually surrendered any rights in the property or control of the operations to the participants, but had merely sold them the right to participate in the profits for a price. The Court of Appeals, in affirming this Court, did so in reliance on I.T. 3948, *supra,* finding that the requisite "collective irrevocable representative capacity" was there present. The facts in that case support those conclusions, but the facts in this case do not. In *United States* v. *Stierwalt, supra,* the court found on the facts there present that each investor gave the agent full authority to arrange for the development of the leased property and the production of oil and gas therefrom, to execute operating agreements, to sell investors' shares, to borrow money for development on the security of the production, and in general to transact any business in furtherance of the venture. We do not find that any such complete authority was vested in Lands Co. by the investors in this case—nor even in the combination of Drilling Co. and Lands Co., if they were to be considered one.

Each case in this area must be determined on its own facts. This does not lend support to an equal application of the tax laws to all

parties involved in oil and gas operations; compare, for example, *Commissioner* v. *Horseshoe L. Syndicate*, 110 F. 2d 748 (C.A. 5) ; and it would be preferable from the standpoint of proper and equitable administration of the tax laws if the terms of all joint arrangements for the operation of mineral properties were spelled out in written agreements. However it is recognized that such has not been the custom; and we would be reluctant to hold, for the time being, at least, that such joint oil and gas ventures, intended to be operated and taxed as partnerships, but which have some of the characteristics of corporations primarily because of the nature of the business engaged in, must be taxed as corporations simply because the precise terms of the arrangements are not always clear.

Our conclusion on this principal issue makes unnecessary our consideration of the other issues raised. However, we think it advisable to refer to the opinion of this Court in *G. F. Hedges, Jr.*, 41 T.C. 695, with reference to the allowable deduction for intangible drilling expenses.

*Decision will be entered for the petitioner.*